The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw near and give their attention where the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Good morning, and we will hear oral argument in our first case momentarily. First, I would like to thank William and Mary for inviting us here this morning. Visiting law schools is one of the more pleasant assignments that we have, and so we appreciate the invitation. And we also appreciate the willingness of the attorneys to accommodate us in this endeavor. We're ready for argument in United States v. Wingle. Good morning. May it please the Court. My name is Peter Eliades, and I represent the appellant in this case, Kenneth A. Wingle. The relevant facts of this case are as follows. In the early morning of September 2, 2012, Mr. Wingle, along with his passenger, was driving on Route 36, which is in Prince George County and also fronts the Fort Lee military base. That particular area is designated as having concurrent jurisdiction both with Prince George County and Fort Lee. At the Sissiski Gate of Fort Lee, but still on Route 36, Officer Michaels of the Fort Lee military police pulled up beside Mr. Wingle, where both vehicles were stopped. This is a four-lane highway. There are two lanes that go eastbound and two lanes that go westbound. They're divided by a median strip. Officer Michaels was in the right lane of the eastbound Route 36, and my client, Mr. Wingle, was in the left lane of the eastbound lanes. Both vehicles, after the light turned green, pulled off from that light, and the evidence in this case was that initially Mr. Wingle pulled ahead of Officer Michaels' unmarked cruiser. Counsel, we're going to generally be familiar with the facts of the case. You can argue it however you wish, but I'm not sure that a lengthy recitation of the facts would help you in terms of the legal arguments. It relates to the argument. The relevant facts then would be that Officer Michaels testified that at some point when he was alongside the vehicle of Mr. Wingle, that he noticed some bluish-white light coming from Mr. Wingle's vehicle, which he thought might be indicative of cell phones being used and perhaps of texting being done by either the passenger or the driver. And then he testified, the officer did, that at some point Mr. Wingle's car drifted towards his vehicle. Officer Michaels testified that because of that drift, he had to hit his brakes, in his words, in order to avoid the potential for there being some sort of collision. Is there a factual dispute here? Of that particular incident? No, Your Honor, there's not. And in fact, some of it was captured on mounted cameras, was it not? That's correct. That's correct. And when we're talking about, in this case, what this court has available to it in looking at whether or not there was clear error on the part of the trial court when it considered those facts, you have the video. And the video, in my mind, other than for that brief period of time where Officer Michaels said the camera could not pick up anything because it was a front-mounted camera and couldn't get Mr. Wingle when he was on his side, I think that the video absolutely speaks for itself. And it's strong evidence, and obviously it was introduced and it's found in Volume 2 of our Joint Appendix. Go ahead. The magistrate judge made a number of factual findings, which is what I think we're reviewing here, including a finding of credibility for the police officer testifying. Are you challenging his credibility finding? Your Honor, not so much his credibility, but perhaps how he explained what happened versus what you see on the camera. And quite frankly, I would be, in some ways, with great respect, challenging Judge Novak's finding at the magistrate court level when he made his findings a fact. I had asked if you were asserting a factual dispute, and it seems as though you are. And what specifically is that, which I think may be part of Judge Agee's question. The minor factual disputes that I would have with Judge Novak's findings are that he said that the defendant's car swerved. He used that term a couple of times, swerved towards the officer's cruiser. That was never the testimony by Officer Michaels. The only word that he used was drift, and that it was a slow drift. Your Honor, there really weren't a whole lot of factual disputes. It really came down to, in the end, Judge Novak trying to find what it was that Officer Michaels stopped Mr. Wingle for. Well, it really comes down to how you view these facts. What do you take these facts to mean in terms of creating an opportunity, if it existed, for the officer to stop him? Under these circumstances, given the nature of the texting statute, you couldn't, at least from my understanding, you couldn't stop him for texting at that time because it's a secondary offense. So then you are left to determine what do those facts mean, the drifting toward the line. And the question I really have for you, if the video, which we would tend to think might be something, unless it's tampered with, might present what one would call objective evidence. In the face of evidence by the officer and his perception, his subjective perception, which one controls in determining whether he had an articulable suspicion to stop him? The video would control, in my mind, Judge. It's there and it's been introduced. There's absolutely nothing surrounding that video that would suggest it being tampered with by anybody, and it is part of this record. Is it because of the video or because of the subjectivity of the officer? I'm sorry, Judge. Is it because you consider the video to be much more objective and that's what's needed, or with the subjective knowledge or the subjective belief of the officer control? It's because it's objective. You get to see, when we're looking to see if there is some reasonable articulable suspicion that has to be objective as articulated, you look at the video and you see what happened. In order for the video to control, that articulation presupposes a conflict between the video and the testimony, correct? Correct. And the explanation that the officer gave at the suppression hearing is that because of the way the video cameras were mounted, they only saw, they captured only a limited portion of what occurred. So specify for me, please, where you see the conflict occurring between what is reflected in the video and the officer's testimony. The conflict is when you watch the video, you do not see any type of maneuver by the officer. And mind you, this is on the officer's cruiser that he is operating. Well, how can you see movement on the part of the officer if the camera is mounted on the front of the car? Judge, his testimony was that he had to suddenly brake, and I believe, again, the magistrate judge's findings of fact were that the officer actually had to swerve to miss Mr. Wingle's vehicle. That is not on the video. You see the very slightest of braking, and you see the first you see of Mr. Wingle's car is that it is in the center of his travel lane. Now, granted, the officer said that the drifting may have happened prior to the camera picking it up, but it's important to note, and I think that the video would be supportive of this for the appellant in this case, that there was no swerving. You see the camera in smooth pursuit, mounted on this vehicle, and there's no sudden braking. This is an argument, I take it, you made to the magistrate judge. Yes, sir. And the magistrate judge took all the evidence and decided against you, set out the reasons for that decision. So your argument now has to be that that finding was clearly erroneous. Yes, sir. It is. I understand that, Judge. But I think in this case, because we have the video, it can be climbed. And I think that in this particular case, if you watch or if you read, in essence, Judge Novak's examination of Mr. Wingle, which is throughout this hearing, he's attempting to find what it is that we have that might violate the Fourth Amendment to the Constitution. As Judge Winn stated earlier, I think that Judge Novak was convinced early on that under 107.8.1 of Title 46.2 of the Virginia Code, that the officer could not have stopped him if it were just for the texting. So when Judge Novak went further... Virginia versus Boer, since this is a case of federal jurisdiction, not state jurisdiction, what difference does that make? Judge, I think it's distinguishable. In this case, if you look at the indictment, you'll see that for the count that dealt with the texting, the government assimilated, through the Code of Federal Regulations, that particular code section dealing with texting. That particular code section has three subparts. And one of its subparts is the specific mandate by the legislature that you can't charge this. You can't even stop. It doesn't say that you just can't arrest someone for it. It says you cannot stop somebody unless there is some other offense. It was not a primary offense at the time. And my argument would be, among others, that the government can't cherry pick that statute. If you've assimilated it and you've charged this defendant under it, then you've got to abide by it. Is that an argument that's in your brief? Judge, we argue in there that Moore didn't apply. And we cited several cases as to why we thought that, in this case, that this is a substantive law. It's all encompassing. And, of course, we cited specifically the subsection C that said that the stop couldn't have been made under 107.8.1 if that were the only offense. And that's what led us down the road in that hearing to questions about what was the other bad driving. And when asked repeatedly by me, the officer said that there really was no other bad driving than the inattentiveness, was his word, inattentiveness by Mr. Wingle. And I think that was as related to the looking down at a phone and the texting. He received a summons or traffic citation for reckless driving, is that correct? No, sir. Oh, that's right, because he got the DUI. Yes, sir. But for a failure to maintain his lane. Yes, sir. And what else was he charged with? Failure to maintain lane, texting while driving, driving under the influence of alcohol, possession of marijuana, and obstruction of justice were the five charges. The officer testified that he would have charged him with reckless driving, but he viewed that as being countermanded in this case because of the DUI charge. That was his testimony, which I would suggest to the court and did in my brief, is a mistake of law. Even when Judge Novak ended up agreeing with him in his opinion, in citing, I believe it was 19.2, 294.1. But even if he made a mistake of law, we really haven't gotten to what was the reasonable articulable suspicion for him to make the stop. And if he thought that there was reckless driving, but he made a mistake in the charging, wouldn't that have fulfilled the condition preceding for the reasonable suspicion to make the stop? I can't disagree with that, Judge. I think it would. But I want to point to the court the multiple times, multiple times, when asked by the court multiple times and by me, Officer Michaels repeatedly said that he had a real problem with this being considered reckless driving. He was kind of guided there, if you will, by the magistrate judge. But when he was asked for the basis for his stop by Captain Adams, he said inattentive driving, drifting, and texting. And he said that on two different occasions. Then he admitted there's really no statute specifically for inattentive driving. And then he was asked by the court, Judge Agee, he said, the court asked, but you didn't charge him with that, right? Talking about reckless driving. No, sir, I didn't feel it warranted a reckless driving ticket. And then the officer later said, I felt that the closest charge that I would have been able to use on this would have been the failing to maintain the lane of travel. That's the closest it comes to physically what he did on the highway. Does that matter? Is the officer's subjective view determinative? It's not determinative. But in this case, the bottom line is that we have to find some sort of violation on the highway of a statute, some sort of motor vehicle violation. And I think, I hope, that we can agree that standing alone we don't have the texting. There's a relative, I think, a pretty strong concession by the government, and I think Judge Hudson may have addressed it, that on the failure to maintain lane of travel, the officer at some point even admits that he doesn't think that the statute covers that because he could never say, no matter how hard the officer was pressed at this hearing, that Mr. Wingle came into his lane. And that didn't have to do with whether or not it was caught on camera. This was Officer Michael's testimony saying that I cannot say that the car crossed over the lane. You have Judge Hudson's review here affirming the magistrate's order, and we've been going back and forth in terms of what the magistrate did in the underlying order and what Judge Hudson did. Of course, Judge Hudson starts out and basically indicates, well, you've got this secondary offense, and he says, however, that logic is, the logic that a secondary offense may not be used to initiate traffic is inconsistent with Supreme Court Fourth Circuit precedent. He doesn't go on that basis, but you can tell from his order, that sort of influences where he goes, and he sets forth three grounds here upon which he says that it exists. But one of the things that he does make a determination of in this order, he says essentially that the officer says he stopped him for texting, and he never mentioned to him anything about drifting. He didn't mention that he was stopping him for reckless driving or for inattentive. He stopped him for texting. And if that is the sole evidence in a case based upon at least the Virginia law at that time, which has changed, as I understand, that may not have been a basis to stop it. So then it comes along the inattentiveness, and inattentiveness is then elevated to some form of recklessness, which I'm concerned, at least in terms of what does that mean? Inattentive driving, because reckless driving in Virginia is pretty serious stuff. And if inattentiveness, and you never get out of the lane, it's clear, he never got out of the lane. That second ground, that third ground that Judge Hutchins brought up about leaving the lane is really kind of not there. But how do you view this in terms of the officer's initial testimony and his basic reason for giving a stop was to text without ever mentioning the inattentiveness, even though it seems texting while driving inherently you are inattentive? Judge, my time is up. May I please answer your question? I think it was interesting, as you point out, that Judge Hudson disagreed with Judge Novak when it came to whether or not the officer could stop solely based on texting. And Judge Hudson's opinion, as I'm sure you know, was that Officer Michaels could, even if it was just to warn Mr. Wengel of the dangerousness of this inattentiveness. I, of course, completely disagree with that as we started off. I guess at that point he's saying that you can, there's an articulable suspicion that's going to be important to something. That's a secondary statute. I don't know what secondary means, if you can stop him to warn. Correct. And I don't quite understand the secondary business in Virginia anyway, and apparently it's been cured, but at least at that time that's the way it was. It was, Judge, and I would agree with the court also that when we don't have that, and I don't think that standing alone we've got the officer had the right to stop based on the texting, then it was just a matter of trying to backfill with the facts that we have, and the facts just aren't there, both from the video and from, as the court points out, and I said earlier that Officer Michaels was unable to say at any point that this car ever drifted from its lane, made any other maneuvers. I asked him specifically, was there impaired driving, was there any form of reckless driving, any weaving, anything of that nature, and the officer answered that in the negative. Mr. Iliadis, your time has expired and you have some time for rebuttal. Thank you. Thank you. Good morning. May it please the court. I'm Catherine Adams representing the United States. Judges, what the appellant is asking you to do is to overrule your court's own precedent and to overrule the Supreme Court's precedent and to also make a finding of clearly erroneous facts by the trial judge, facts which were affirmed by the district court judge. The officer in this case had reasonable articulable suspicion to initiate a traffic stop based upon his observation of the appellant texting while driving, driving so recklessly that he almost collided with the officer's own patrol vehicle, and also failing to maintain lane. Would texting alone be sufficient? Yes, Your Honor, it would. And the basis of that, what is the secondary offense? Well, Your Honor, if you could actually look at the statute at hand, it's Virginia Statute section 46.2-1078.1. That statute is broken down into several sections. Section A actually lays out the elements of the offense. Section B lays out exceptions. And then Section C, which the appellant has cited in their briefs, is a matter of criminal procedure. That is a direction towards officers not to issue a citation. There's nothing in here that says you can't initiate a traffic stop. It simply says you can't issue a citation. So when an officer observes somebody texting while driving, they have violated the elements in Section A. They have committed a traffic offense. Section C is simply a direction from the legislature regarding criminal procedure, that being a state statute. And so under Virginia v. Moore, that criminal procedure isn't going to be assimilated into this case. I understood that the district court, and it was a little unclear to say that the statute did not preclude, there was no prohibition against the officer stopping the vehicle for the purpose of warning the driver about his potentially hazardous conduct. But I do not understand the texting statute to authorize a stop to warn if it's not possible to issue a citation based on the stop. Well, ma'am, the statute doesn't explicitly authorize it, but it doesn't explicitly prohibit it either. The legislature could have drafted Part C, which is the criminal procedure part of the statute, to say an officer cannot initiate a traffic stop. But that's not what the legislature did. They said no citation shall issue. And then in Subpart D of the statute, it says a violation of any provision of this section shall constitute a traffic infraction. So if somebody has committed a violation of Section A, which lays out the elements of the offense, they have committed a traffic violation. So when an officer observes somebody basically hitting those elements, he has reasonable articulable suspicion to initiate a traffic stop for a traffic violation. That seems to make good common sense, but we're stuck with the law here. And no case in Virginia held that before. And in fact, they changed the law so as to make it a primary offense. There's a reason you did that. If your position is true, then you wouldn't have had to change the law. You could stop them to one. And it just doesn't seem to follow that you can't issue a citation, but you can stop someone. And we have to put this into context. We're talking about a new law that comes about with texting, and I can imagine you're moving very carefully with this because you don't know where it's going to go. I mean, people are picking up the phone, doing all kinds of stuff. You don't want everybody getting a citation for it. And so it's an evolving law, and you were stuck with the law as it was from its inception. It is not that way anymore. I mean, you can stop them now, and that seems to follow the good common sense route, but aren't we stuck with the law here on this? I mean, texting is just not enough under the previous law to stop a car. You see someone texting, and it didn't say you saw him texting in conjunction with the drifting. You saw him texting, and he says the drifting. Of course, then the drifting part is something that comes up because his initial statement to the driver is texting. He doesn't mention drifting. He doesn't mention reckless. He doesn't mention anything else. That comes up. I don't know if it's an education thing you go through that you figure out that that's not going to be enough, so you come up with it or whatever, but the bottom line is he never left that lane, and I don't know what that means in terms of factual terms. Common sense says, yes, it looks that way, but I'm not sure it fits the law. Well, sir, you've hit on several different cases that I would like to discuss, the first being Virginia v. Moore, and then you've also brought up U.S. v. Tibbetts and U.S. v. Johnson. So your discussion regarding the statute as it existed at the time, when we talk about subsection C, which is the legislature saying this is going to be a secondary offense versus a primary offense, that isn't the legislature saying that when somebody violates section A, they aren't committing a traffic infraction. That is the legislature basically giving a direction to officers regarding allocation of resources. But hasn't Virginia case law made it fairly clear that, at least with respect to secondary offenses, because you couldn't enforce them, you couldn't stop them? This is where, as I recall, the district court and the magistrate judge disagreed. The magistrate judge cited Virginia case law for the proposition that, because an officer may not enforce the texting statute, absent another violation, an officer may not stop a vehicle based solely on a violation of the statute. Well, ma'am, with all due respect to the magistrate judge, I think he got the statute wrong, whereas the district court judge read the statute correctly. Well, but the magistrate judge wasn't interpreting the statute. The magistrate judge was relying on state law that specifically so held. For example, Commonwealth versus Graham, noting that the legislature specifically withdrew authority for law enforcement officers to stop vehicles for a secondary offense. Yes, ma'am. Please stop talking, ma'am. Your Honor, that is the legislature's direction, which is a matter of criminal procedure. When the legislature gives that direction, they're not saying this is no longer a violation. It is a violation. Are you saying that Virginia courts misinterpreted Virginia law? No, Your Honor. In the context of Virginia v. Moore, when an officer observes somebody committing a traffic infraction and there is a separate state criminal procedure part of the statute that says primary versus secondary offense, that criminal procedure part is not going to be assimilated. When we assimilate a state charge, we are only assimilating the offense, the violation itself. We're not assimilating the criminal procedure, and that's exactly what Virginia v. Moore stands for. If we do not agree with you about your interpretation of the texting statute, do you lose? No, Your Honor, not at all, because the officer clearly had reasonable articulable suspicion to pull over the appellant because the appellant almost crashed into his own patrol car due to his reckless driving. Isn't that a bit of an overstatement? No, Your Honor. The appellant's attorney did go into the facts of the case to quite a great extent, and I would just remind the court of the standard of review here. We are looking at the facts in the light most favorable to the party prevailing at this district court unless the fact findings were clearly erroneous. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. I understand the appellant to be arguing that the video cam supports, in fact disagrees with, the testimony of Officer Michael at the suppression hearing. I would disagree with that, Your Honor. The video actually corroborates Officer Michael's testimony. Officer Michael's testified that the two vehicles were parallel. The dash cam only being able to show what is in front of the vehicle, it couldn't show the fact that the appellant's vehicle was directly parallel adjacent to his. What the video does show is the two vehicles coming off of the stop and then Officer Michael's vehicle suddenly coming to a stop. Did it come to a stop or break? It breaks, Your Honor. Coming to a sudden break, and then the appellant's vehicle moving forward. And that exactly corroborates Officer Michael's testimony, which is that he had to break in order to avoid a collision. There's really no other explanation for Officer Michael's patrol vehicle suddenly slowing down, coming to a break, while the other vehicle proceeds forward. Is there a statute that prohibits drifting of a vehicle? Well, Your Honor, Officer Michael's did cite the appellant. I know that he cited it. I'm asking you. Is there a statute that prohibits a vehicle in a lane drifting? I mean, lanes, depending on how large they are, I mean, a car can move toward the center line and never cross it, which, in this instance, the evidence is clear. It never did cross it. I mean, I don't know what that means. I mean, if you're driving down the road, and I always think of these cases in terms of what does this mean if we hold as you want us to hold on this? It may fit just neatly with these sets of facts, but facts, cases, apply across the board when we set the law. And if we say that mere or any level of drifting can constitute reckless driving under these circumstances, what does that mean? Well, Your Honor, what Officer Michael... But answer the first question. Is there a statute that prohibits drifting? There is a statute that prohibits reckless driving, and if the drifting is reckless, then that reckless driving statute could apply, Your Honor. But drifting alone with nothing more, is that inherently a reckless charge? Well, Your Honor, Officer Michael's observation was that it was because when the vehicle started drifting towards his vehicle, it almost crashed into the vehicle. So when we talk about the reckless driving statute... Where did you get that from? That almost crashed into the vehicle. Where is his testimony to that extent? Your Honor, Officer Michael's testified that he had to apply his brakes in order to avoid a collision. But I want to know about the almost crashed. That sounds rather... That makes it sound much more imminent or something, but almost, or I thought he just simply said it was drifting and he had to hit his brakes because he thought that it might come over his side, but it never did. Well, Your Honor, the reason that we have lane lines and the reason why the failure to maintain statute exists is because those lane lines are there to protect two vehicles from... He maintained his lane. Well, Officer Michael cited him for failure to maintain his lane because at the time... But he maintained it. The facts are he maintained his lane. Officer Michael's testified that the two vehicles were proceeding parallel, that the appellant's vehicle almost drifted into his. Now, he couldn't actually see whether or not... No, he didn't say almost drifted into his. I mean, and that's where we sort of... Where are you going with this? I mean, I can very well see an instance where a car's riding parallel and then all of a sudden it swerves over violently and it looks like it's... And both didn't jerk back. And that's not the testimony here. The testimony is simply he's riding alongside him and he sees one kind of moving over a little bit and he says it's drifting. And then that's reckless driving? Well, I think when that driving behavior causes a law enforcement officer to engage in defensive driving by applying his brakes in order to avoid the two vehicles colliding... Actually, the magistrate judge quoted from the testimony at the suppression hearing that as Officer Michael observed defendant's vehicle drifting, he was unable to determine if defendant's vehicle actually crossed the dividing line between the lanes. However, Officer Michael applied his brakes so that defendant's vehicle would not hit Officer Michael's car. Exactly, Your Honor. Was Officer Michael allowed... What is unclear to me here is the effect that the secondary status of the texting offense at the time had in combination with the drifting. Was it... What is your support for the proposition that it was permissible for Officer Michael to consider the drifting and the fact that he applied his brakes so that defendant's vehicle would not hit his car along with the texting for which he was, as I read the Virginia case law, not allowed to stop solely on the basis of? Well, yes, Your Honor. We certainly would still argue that even if there were no other driving behavior, Officer Michaels could pull him over for texting while driving under Virginia v. Moore. But if you disagree with us on that point, Officer Michaels also had reasonable articulable suspicion that he was driving recklessly and that he failed to maintain lane. And as Officer Michaels explained later, he didn't end up citing him with reckless driving because this ended up being a DUI stop and a marijuana possession stop, and he wasn't going to cite him for both DUI and reckless driving. He was under the impression, apparently, that he couldn't. Yes, Your Honor. But that doesn't go... I mean, that is a decision that he made later on. That was a charging decision. That was an officer discretion issue. And what we're talking about here is reasonable articulable suspicion at the time to initiate a traffic stop. Now, Judge Winn had brought up the Tibbetts case and the Johnson case in the question that he was asking. When Officer Michaels pulled him over and informed him, I pulled you over for texting while driving, the appellant has argued that that basically negates any other sort of predicate violation, which then... We've pretty clearly addressed Tibbetts. Yes, Your Honor, you have, as we raised in our 28J letter. But just the fact that Officer Michaels informed the appellant that he was pulled over for texting while driving doesn't mean that that was the only predicate violation giving him reasonable articulable suspicion to initiate the traffic stop. I think we understand your argument. You have nothing further? Apparently you have a few seconds if you wish to conclude. Well, Your Honor, I just conclude in finding that the facts here aren't such that this court could make a finding that both the magistrate court judge and the district court judge made clearly erroneous findings of fact. We would simply ask that you uphold your own precedent as well as the precedent of the Supreme Court and affirm the findings of the lower courts. Thank you. May it please the court, I want to address first the government's comment to the court that they have absolutely no problem in arguing that the Officer Michaels could stop the defendant, even if it was just for some sort of a warning, that he may not be able to issue a citation. Again, I call the court's attention to the actual language of the statute that says no citation for a violation of this section shall be issued unless the officer issuing such citation has cause to stop or arrest the driver of such motor vehicle. So I think it was all inclusive, and I agree with Judge Wynn that it was changed for that reason by the Virginia legislature shortly after this case. And I think in this case there is no question that that could not have been the sole reason for the stop. The attempt, if you will, by the government, in its case, to then try to fall back on reckless driving. And even though, of all things, that was the one not charged. We have failure to maintain a lane of travel. That didn't pass muster because the officer could never say that the defendant, in this case Mr. Wingle, came over into his lane, that it was adrift. So we fall back on what we would perhaps in Virginia call the catch-all statute of reckless driving. But Judge Duncan, you mentioned it yourself. That's a very serious statute, and I think Judge Wynn said it as well. It's a Class I misdemeanor, and it calls for driving that would put somebody in fear of safety of their life, limb, or property. It has to be that type of operation. And again, let's go back to the video, if you will, and look at that. And there is not a sudden break. There's certainly not an almost crash. There is an officer that has a camera mounted to his vehicle that shows that he perhaps slowed down a little bit and allowed Mr. Wingle to go by. And then the very first time you see in the evidence in this case Mr. Wingle's car dead center of his travel lane, the lights go on with the officer's vehicle, and Mr. Wingle puts his right blinker on, gets over into the right lane properly. The officer corroborates that in his testimony, then turns right into the hotel parking lot where the search took place, again, with absolutely no problems. And the officer was asked whether there was any other bad driving other than that statement earlier of the slow drift, and he said no. For those reasons and for those I've given the court earlier, we'd ask the court to reverse. Thank you very much. Thank you. We will come down and re-counsel and proceed to the next case, and we'll allow a few minutes for the changing of the guard for the students. But before we do that, I would like to thank you very much, Mr. Filiades. Am I pronouncing that right? Filiades. Filiades, I'm sorry. I know that you are court-appointed, and we want to tell you how very much we appreciate your service to the court. Thank you.
judges: Allyson K. Duncan, G. Steven Agee, James A. Wynn, Jr.